IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>BARON LOMBARDO, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS<br><br><br><br><br><br>Case No. 2:07-CR-286 TS |

On May 9, 2007, a grand jury returned a thirty-four count Indictment charging Defendants with conspiring in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), committing bank fraud, transmitting wagering information in violation of the Wire Act,[1] and laundering money. Currently before the Court are Defendants' motions to dismiss[2] the Indictment, each styled as follows: (1) Motion to Dismiss Wire Act Counts (Counts 16-19)[3] (the "Wire Act Motion"); (2) Motion to Dismiss Count One (RICO Conspiracy)[4] (the "RICO Motion"); and (3)

---

[1]18 U.S.C. § 1084(a).

[2]Defendant Carson-Selman filed the motions to dismiss, in which each of the six other individual defendants have now joined.

[3]Docket No. 80.

[4]Docket No. 78.

1

Motion to Dismiss Based on Treaty Obligations and Domestic and International Law (Counts 1, 16-19)[5] (the "GATS Motion").  The Wire Act Motion and the RICO Motion are challenges to the sufficiency of the allegations in the Indictment.  The GATS Motion asserts that the prosecution of Defendants in this case violates the obligations of the United States under the General Agreement on Trade in Services ("GATS").

The Court heard oral argument regarding the matters on November 29, 2007.  Having taken the matters under advisement, the Court now denies each of the motions to dismiss for the reasons set forth below.

## I.  THE INDICTMENT

As two of the motions to dismiss challenge the sufficiency of the Indictment, the Court begins with a detailed summary of the conduct alleged therein:  The charges in the Indictment arise from an alleged criminal "Enterprise" created for the purpose of providing transaction processing services to illegal gambling websites.  The Enterprise consisted of individual defendants Baron Lombardo, Richard Carson-Selman, Henry Bankey, Tina Hill, Count Lombardo, Frank Lombardo, and Kimberlie Lombardo, as well as entity defendants CurrenC Worldwide, LTD, Gateway Technologies, LLC, Hill Financial Services, Inc., and BETUS.  Through the various entities, the Enterprise maintained a website called the "Gateway," which it used to facilitate payments made by bettors to various gambling websites.  When bettors wished to gamble at one of the gambling websites serviced by the Enterprise, their payment information was forwarded by the gambling site to the Gateway for processing.

---

[5]Docket No. 79.

When a bettor opted to pay using a Visa or MasterCard credit card, the Gateway processed the bettor's credit card payment information by mis-classifying the charge in order to hide its gambling nature, thus duping banks into disbursing funds. The Enterprise paid money to at least one bank employee to ensure that mis-coded credit card charges were processed and paid.

When a bettor selected the "Western Union" payment option, he or she was instructed by the Enterprise to wire funds to a Western Union office in the Philippines where an agent of the Enterprise collected and then deposited the funds into bank accounts held by the Enterprise. The Enterprise then notified the referring website that the money had been received and the bettor was allowed by the website to gamble.

Gambling website operators were provided with constant access to information regarding the status of credit card payments and wire transfers via the Gateway. Money was held by the Enterprise in foreign banks and was transferred to the United States through payments to accounts, entities, and individuals associated with the Enterprise. Some of the funds were also reposed in various trusts created by the Enterprise. The Enterprise charged the gambling website operators substantial per-transaction fees on all credit card payments and wire transfers processed through the Gateway, thus enriching the Enterprise.

Each of the Defendants played a role in the operations of the Enterprise. Baron Lombardo, Henry Bankey, and Richard Carson-Selman created a company by the name of CurrenC Worldwide, LTD, through which the Enterprise conducted much of the payment processing. Baron Lombardo controlled the movement of gambling funds through credit card transactions via Gateway Technologies, which operated and maintained the Gateway website. Richard Carson-Selman was responsible for selling the payment processing services to gambling websites. Tina Hill created Hill Financial to provide the accounting services necessary to move and track the gambling funds. Henry

Bankey supervised the creation of this accounting system.  Count Lombardo managed and maintained the equipment on which the Gateway website was operated.  Kimberlie and Frank Lombardo managed the system through which the Western Union wire transfers were processed.

The objects of the conspiracy were as follows: "to make money illegally by helping Internet gambling [websites] conduct their illegal business"; "to transfer the proceeds of its illegal operations into and out of the United States; to conceal its operations from the legitimate credit card companies, banks and wire transfer services it used; to conceal its operations from law enforcement agencies; and to evade the payment of federal taxes due to the United States from the [c]onspirators, their employees and agents."[6]

Count 1 of the Indictment also specifically alleges that "no later than 2000," Defendants knowingly and intentionally conspired to participate in and conduct the affairs of the Enterprise, affecting interstate and foreign commerce, through a pattern of racketeering activity consisting of violations of the following: Georgia Code Ann § 16-12-22, 28; 720 Ill. Comp. Stat. 5/28-1.1; Mo. Rev. Stat. § 572.030; 18 U.S.C. § 1084; 18 U.S.C. § 1344; and 18 U.S.C. § 1956.  As part of the conspiracy, each of the Defendants agreed to commit at least two acts of racketeering activity.  The Indictment also alleges multiple transmissions or money wires as overt acts.

The Indictment further charges Defendants with four counts of violating the Wire Act (Counts 16-19) by using a wire communication facility "for the transmission in interstate or foreign commerce . . . [of] information assisting in the placing of bets and wagers on sporting events and contests, and a wire communication which entitled the recipient to receive money and credit as a result of bets and wagers, and information assisting in the placing of bets and wagers," as per the

_____

[6]Indictment ¶ 4 (Docket No. 1).

4

statutory language of 18 U.S.C. § 1084(a).[7]  The Indictment alleges that Defendants did these acts "in the course of aiding and abetting individuals engaged in the business of betting and wagering."[8] Paragraph 38 alleges four specific transmissions, each corresponding to a count in the Indictment, including their respective dates of transmission and places of origin and destination.

Although not relevant to the pending motions, the Indictment also sets forth charges of bank fraud and money laundering.

## II.  SUFFICIENCY OF THE INDICTMENT

The Wire Act Motion and the RICO Motion challenge the sufficiency of the allegations in the Indictment concerning the alleged violations of the Wire Act and the alleged RICO conspiracy. Federal Rule of Criminal Procedure 7(c)(1) requires that the Indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  This standard "embodies" the Tenth Circuit test for reviewing the sufficiency of an indictment:[9] "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense."[10]  The sufficiency test is based solely on the allegations contained in the Indictment, each of which are assumed to be true.[11]  "An indictment need only meet minimal constitutional standards,

---

[7]*Id.* at ¶ 38.

[8]*Id.*

[9]*United States v. Darrell*, 828 F.2d 644, 647 (10th Cir. 1987).

[10]*United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)).

[11]*Id.*

5

and [the court] determine[s] the sufficiency of an indictment by practical rather than technical considerations."[12]

"An indictment that sets forth the words of the statute generally is sufficient so long as the statute itself adequately states the elements of the offense."[13]  However, "[w]here guilt depends so crucially upon . . . a specific identification of fact . . . an indictment must do more than simply repeat the language of the criminal statute."[14]  Thus, the Supreme Court required an indictment for the offense of refusing to answer "any question pertinent to the subject under inquiry" before a committee or subcommittee of Congress to include a specific allegation regarding the subject under inquiry.[15]  Yet, where the allegations set forth the statutory elements of an obscenity charge, implicitly carrying with it a legal definition, specific factual averments were unnecessary.[16]

## A.  The Wire Act Motion

In the Wire Act Motion, Defendants ask the Court to dismiss on sufficiency grounds Counts 16-19 of the Indictment, which charge them with violating 18 U.S.C. § 1084(a).  Section 1084(a) of the Wire Act punishes the transmission of certain wagers and information related thereto as follows:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the

---

[12]*Dashney*, 117 F.3d at 1205.

[13]*Darrell*, 828 F.2d at 647 (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

[14]*Hamling*, 418 U.S. at 118.

[15]*Russell v. United States*, 369 U.S. 749, 754-55 (1962).

[16]*Hamling*, 418 U.S. at 117-19.

recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.[17]

Section 1084(b) makes two notable exceptions to this prohibition:

Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.[18]

In order to prove a § 1084(a) violation, the government must show that (1) "the defendant regularly devoted time, attention and labor to betting or wagering for profit," (2) "the defendant used a wire communication facility: (a) to place bets or wagers on any sporting event or contest; or (b) to provide information to assist with the placing of bets or wagers; or (c) to inform someone that he or she had won a bet or wager and was entitled to payment or credit," and (3) "the transmission was made from one state to another state or foreign country."[19]

Defendants challenge the sufficiency of the Wire Act allegations solely with respect to the second element above, arguing as follows: (1) that § 1084 reaches wire communications concerning betting or wagering on sporting events or contests only, and not on other games of chance such as those employed by online casinos; (2) that the language regarding the use of wire communications for "information assisting in the placing of bets or wagers" prohibits only those communications that lead to the placement of an actual bet or wager; and (3) that the language concerning

---

[17]18 U.S.C. § 1084(a).

[18]18 U.S.C. § 1084(b).

[19]Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, *Criminal Pattern Jury Instructions* 2.51 (2005).

communications that "entitle[] the recipient to receive money or credit as a result of bets or wagers" does not prohibit communications that merely discuss or request a transfer of money or credit. From these contentions, Defendants argue that the Indictment fails to allege a violation of the Wire Act because the government did not set forth specific facts regarding bets or wagers actually placed on sporting events or contests or a specific communication entitling a recipient to the payment of money or credit from such bets or wagers.

Defendants also argue that the allegations in the Indictment are unconstitutionally vague, failing to provide them with meaningful notice as to the charges against them in violation of the Sixth Amendment. However, as the Tenth Circuit analysis regarding the sufficiency of an indictment encompasses both the Rule 7(c)(1) test and the constitutional requirements, the Court will analyze Defendants' constitutional concerns within this framework, as outlined above.

*Sporting Events or Contests*

First, Defendants assert that the Wire Act applies to wire communications related to betting or wagering on sporting events or contests alone. The Wire Act was enacted in 1961, long before the rise of the Internet as a potential marketplace for gambling. Most prosecutions under § 1084(a) have involved the practice of bookmaking, or taking bets on sporting events over the telephone. The advent of the Internet has resulted in the availability of casino-like gambling online, squarely presenting the question of whether § 1084(a) applies to wire communications related to this type of gambling. Very few courts have directly considered this question.

Before engaging in analysis of this issue, the Court notes that even if § 1084(a) does not reach bets or wagers unrelated to sports, Counts 16-19 would not need to be dismissed in their

entirety, but only insofar as the alleged wire communications relate to non-sports betting or wagering.[20]  Paragraph 38 of the Indictment alleges that Defendants

> did knowingly use and cause the use of a wire communication facility, for the transmission . . . [of] information assisting in the placing of bets and wagers on sporting events and contests, and a wire communication which entitled the recipient to receive money and credit as a result of bets and wagers, and information assisting in the placing of bets and wagers."

Notably, the Indictment does not allege the transmission of actual bets or wagers on sporting events or contests, but rather the transmission of "information assisting in the placing of bets and wagers on sporting events and contests."

By tracking the language of the Statute and specifically including the term "sporting events," the Indictment adequately alleges a violation of § 1084(a) based on the transmission of communications related to bets or wagers on a sporting event or contest.  If the language of the statute is interpreted as applying to communications related to bets or wagers on sporting events or contests alone, the inclusion in the Indictment of the language of the statute would signal the same. Moreover, the indictment specifically uses the "sporting event" language to allege this element of the offense.  The statutory language and the specific wire communications, including the dates and points of origin and destination of their transmission, alleged in Paragraph 38 give Defendants adequate notice that they must defend a charge of violating the Wire Act based solely on the specified transmissions.  Likewise, these allegations would clearly form the basis upon which Defendants could assert a double jeopardy defense in a future prosecution based on the listed transmissions.

---

[20]*See United States v. Miller*, 471 U.S. 130, 136, 144 (1985).

Thus, the Indictment sufficiently alleges a violation of the Wire Act stemming from the transmission of wire communications related to sports betting. Nonetheless, the Court deems it appropriate, both for purposes of the Wire Act Motion and in anticipation of trial, to decide now whether § 1084(a) applies to wire communications related to non-sports bets or wagers.

The Fifth Circuit has determined that § 1084(a) only prohibits transmissions related to bets or wagers on sporting events or contests.[21] In the case of *In re MasterCard International Inc., Internet Gambling Litigation*, the United States District Court for the Eastern District of Louisiana considered a civil RICO claim against several credit card companies and issuing banks, alleging, among other predicate acts, that the credit card companies violated the Wire Act by allowing the use of credit cards to fund gambling transactions at gambling websites.[22] The plaintiffs had collectively lost thousands of dollars by gambling at online gambling websites using their credit cards.[23] The court rejected the plaintiffs' assertion that the Wire Act "does not require sporting events or contests to be the object of gambling" based on the court's "plain reading of the statutory language," highlighting that both the rule in § 1084(a) and the exceptions in § 1084(b) "expressly qualify the nature of the gambling activity as that related to a 'sporting event or contest.'"[24] Several cases were cited by the court for the proposition that "[a] reading of the caselaw leads to the same conclusion," which opinions seem to assume that § 1084(a) applies only to sports betting, although they did not

---

[21]*In re MasterCard Int'l Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468, 480-81 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002).

[22]*Id.* at 473-75, 478.

[23]*Id.* at 474-75.

[24]*Id.* at 480.

specifically address whether it could be applied to communications related to non-sports betting.[25] The court also relied on then-pending legislation that would have modified the Wire Act to reach forms of gambling unrelated to sports, finding that the perceived need to amend the Wire Act's language to cover such gambling was indicative of its absence in the statute's current form.[26] Lastly, the court pointed to a floor statement offered by the House Judiciary Committee Chairman regarding the Wire Act: "this particular bill involves the transmission of wagers or bets and layoffs on horse racing and other sporting events."[27]

A Fifth Circuit panel summarily affirmed the district court's analysis, stating only that it "agree[d] with the district court's statutory interpretation, its reading of the relevant case law, its summary of the relevant legislative history, and its conclusion."[28]  Interestingly, the court noted that the civil plaintiffs in the *MasterCard* case, who were essentially seeking to avoid their gambling debts, were not exactly sympathetic and should not be allowed "to avoid meeting obligations they voluntarily took on" as "they got exactly what they bargained for."[29]

---

[25]*See id.* (citing *United States v. Kaczowski*, 114 F. Supp. 2d 143, 153 (W.D.N.Y. 2000); *United States v. Sellers*, 483 F.2d 37, 45 (5th Cir. 1973), *overruled on other grounds by United States v. McKeever*, 905 F.2d 829 (5th Cir. 1990); *United States v. Marder*, 474 F.2d 1192, 1194 (5th Cir. 1973)).

[26]*Id.*

[27]*Id.* at 480-81 (quoting 107 Cong. Rec. 16533 (Aug. 21, 1961)).

[28]*In re MasterCard Int'l Inc. Internet Gambling Litig.*, 313 F.3d 257, 262 (5th Cir. 2002).

[29]*Id.* at 264.

At least one court has determined that § 1084(a) applies to wire communications related to online gambling in the form of "virtual slots, blackjack, or roulette."[30]  In *New York v. World Interactive Gaming Corporation*, the Attorney General of New York sought, among other things, to enjoin an online casino based in Antigua from "running any aspect of their Internet gambling business within the State of New York."[31]  The action was brought pursuant to a New York law allowing "the Attorney General to bring a special proceeding against a person or business committing repeated or persistent fraudulent or illegal acts" under either New York or Federal law.[32]  The Wire Act was among the federal laws of which the casino was accused of violating.  Without directly considering the "sporting event or contest" language of § 1084(a), the court held that "[b]y hosting this casino and exchanging betting information with the user, an illegal communication in violation of the Wire Act . . . has occurred."[33]  In so doing the court pointed to legislative history found in the House Report concerning the Wire Act which states:

> The purpose of the bill is to assist various States and the District of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, *and like offenses* and to aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information in interstate and foreign commerce.[34]

---

[30]*N.Y. v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 848, 850-52 (N.Y. Sup. Ct. 1999).

[31]*Id.* at 847-48.

[32]*Id.* at 848.

[33]*Id.* at 852.

[34]*Id.* at 851 (citing H.R. Rep. No. 967 (1961) *as reprinted in* 1961 U.S.C.C.A.N. 2631, 2631) (emphasis added).

Having carefully examined the language of the statute as well as the cases above, the Court concludes that § 1084(a) is not confined entirely to wire communications related to sports betting or wagering.  The statue proscribes using a wire communication facility (1) "for the transmission . . . of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest"; or (2) "for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers"; or (3) "for information assisting in the placing of bets or wagers."  The phrase "sporting event or contest" modifies only the first of these three uses of a wire communication facility.  Giving effect to the presumably intentional[35] exclusion of the "sporting event or contest" qualifier from the second and third prohibited uses indicates that at least part of § 1084(a) applies to forms of gambling that are unrelated to sporting events.

This interpretation aligns with the Tenth Circuit's *Criminal Pattern Jury Instructions*, which do not attach the "sporting event or contest" qualifier to either providing information assisting in the placing of bets or wagers or informing someone of his or her entitlement to money or credit resulting from bets or wagers.  Moreover, § 1084(d) requires a common carrier, upon notice, to cease from operating any facility that is or will be used "for the purpose of transmitting or receiving gambling information," unqualified by any relation to a sporting event or contest.  This largely negates the fact that the exceptions in § 1084(b) refer to betting on sporting events or contests alone.

Admittedly, the language of the statute limits the prohibition on the transmission of actual bets or wagers to those on sporting events or contests.  This could lead to the conclusion, as it apparently did in the *MasterCard* case, that when the phrase "bets or wagers" is used in the second and third prohibited uses, it is actually referring to the "bets or wagers on any sporting event or

---

[35]*See Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2765-66 (2006).

contest" language found in the first prohibited use.  However, this conclusion would essentially require the Court to find that the failure to include the phrase "sporting events or contests" in the second and third prohibited uses was an inadvertent mistake of Congress.

The absence of the "sporting event or contest" qualifier in the second and third prohibitions is conspicuous, especially as the first prohibition, which includes the qualifier, is directly before the second and third prohibitions in the statute.  This is particularly weighty in light of the legislative history of the Wire Act, which indicates the intent of Congress to facilitate enforcement of state gambling laws related to "gambling, bookmaking, and like offenses."  Moreover, the exact phrase "information assisting in the placing of bets or wagers" is used twice in § 1084(a)—first, as part of the first prohibited use, and second, as the entirety of the third prohibited use.  It is simply unpalatable to the Court to attribute no meaning to Congress's use of the same phrase in two different parts of the statute where the first use is modified by the phrase "sporting event or contest" and the second use is not.  Accordingly, the Court concludes that the second and third prohibited uses of a wire communication facility under § 1084(a) do not require that the bets or wagers to which those uses relate be limited to bets or wagers placed on sporting events or contests alone.

Defendants assert that the Wire Act is at least ambiguous as to whether it reaches communications related to non-sports betting and that the rule of lenity requires a court to "interpret [an ambiguous criminal statute] in favor of the defendant."[36]  However, the rule of lenity applies only where the statute includes "a grievous ambiguity or uncertainty in [its] language and structure.'"[37] As the Court finds that the plain language of § 1084(a) concerning the second and third prohibited

---

[36]*United States v. Michel*, 446 F.3d 1122, 1135 (10th Cir. 2006).

[37]*Id.* (quoting *United States v. Onheiber*, 173 F.3d 1254, 1256 (10th Cir. 1999)).

uses is unambiguously broad enough to encompass use of a wire communications facility for transmissions related to non-sports betting or wagering, the rule of lenity has no application to its interpretation.

### Information Assisting in the Placing of Bets or Wagers

Next Defendants claim that the phrase "information assisting in the placing of bets or wagers" should be interpreted to encompass only communications that result in the actual placement of a bet or wager, and that because the government has not alleged any specific bets in Counts 16-19, the Court should dismiss them.  In making this assertion, Defendants rely entirely on the case of *Truchinski v. United States* from the Eighth Circuit.[38]  In that case, the court found that a statement made by the defendant over the telephone that "there wasn't much doing that day, only two games going that day" was information assisting in the placing of bets or wagers when "[c]onsidering the method of operation of those generally engaged in the taking of bets, the frequency with which the [bettor] would place bets with the [defendant], plus the fact that the bet was placed."[39]  Although the *Truchinski* case did look to the fact that a bet was placed in determining whether the statement regarding the games on which to bet was "information assisting in the placing of bets or wagers," the court did not affirmatively hold that proof of an actual bet or wager arising from the information in the communication is a necessary element of a § 1084(a) violation such that it must be alleged in an indictment.

Although the statute seems to contemplate that the "information" assist in the placement of an actual bet or wager, none of the cases cited by the parties stands for the proposition that the

---

[38] 393 F.2d 627 (8th Cir. 1968).

[39] *Id.* at 631.

government must allege specific bets in the Indictment that were assisted by information in the alleged wire communication.  Rather, the language of the statute set forth in the Indictment adequately alleges that the specific wire communications listed in Counts 16-19—each of which includes its date, origin, and destination—contained information "assisting in the placing of bets or wagers."  Whether the alleged transmissions actually contained information assisting in the placing of a bet or wager is a question of fact to be made by the jury after receiving proper instruction from the Court on the applicable law.  Accordingly, the Court holds that the Indictment need not allege a specific bet or wager the placement of which was assisted by the information in the alleged wire communication.

*Communications That Entitle the Recipient to Receive Money or Credit*

Lastly, Defendants contend that the language in § 1084(a) prohibiting transmissions of wire communications that "entitle[] the recipient to receive money or credit as a result of bets or wagers" does not include communications merely discussing or requesting a transfer of money or credit resulting from wagers.  Defendants also point out that this language is limited to communications that entitle the *recipient* to money or credit.  The government asserts that the statute clearly includes communications that "entitle" the recipient to "credit" as well as money, and should therefore reach promises to pay and not just entitlements comparable to negotiated instruments.

Regardless of the reach of the word "entitles" as found in the statute, nothing in the cases cited by the parties requires the government to allege a specific entitlement resulting from a specific bet or wager.  The allegation that one or more of the specific wire communications listed in Paragraph 38 of the Indictment are "wire communication[s] which entitled the recipient to receive money and credit as a result of bets and wagers," which tracks the language of § 1084(a), sufficiently apprises Defendants of this element of a Wire Act violation and that they will have to defend a

16

charge of violating the Wire Act arising therefrom.  Any haggling over the proper interpretation of "entitles" is appropriately decided upon the submission of proposed jury instructions.

In sum, the Indictment properly sets forth the Wire Act elements challenged by Defendants using the language of the statute and listing the specific wire communications, including their respective dates, origins, and destinations.  Certainly the Indictment could have been more specific; however, it sufficiently notifies Defendants that they are charged with a violation of § 1084(a) stemming from the specific wire communications listed therein.  This will also allow Defendants to assert a double jeopardy defense in a future prosecution based on the listed communications.  Therefore, the Court will deny the Wire Act Motion.

## B.  The RICO Motion

In the RICO motion, Defendants challenge the sufficiency of Count 1 of the Indictment, which charges each of the Defendants with a violation of 18 U.S.C. § 1962(d), or RICO conspiracy. Section 1962(d) requires the government to prove "that the defendant: (1) by knowing about and agreeing to facilitate the commission of two or more acts (2) constituting a pattern (3) of racketeering activity (4) participates in (5) an enterprise (6) the activities of which affect interstate or foreign commerce."[40]

Defendants challenge the sufficiency of the RICO conspiracy charge only with respect to the "enterprise" and "pattern of racketeering activity" elements, claiming that the Indictment fails to properly allege them.  The government addresses the merits of these claims in the alternative, but initially asserts that the RICO Motion is an inappropriate challenge to the sufficiency of the government's evidence, rather than the sufficiency of the Indictment.  Although the level of detail

---

[40]*United States v. Smith*, 413 F.3d 1253, 1266 (10th Cir. 2005).

with which Defendants would require the government to set forth the allegations in the Indictment is generally not required, the Court finds that the RICO Motion appropriately challenges the sufficiency of the allegations in the Indictment.  However, as set forth below, the Court concludes that the Indictment is sufficient on its face and therefore will deny the RICO Motion.

*The "Enterprise" Element*

In order to prove the existence of a RICO enterprise, the government must show: (1) "the existence of an ongoing organization with a decision making framework or mechanism for controlling the group," (2) that "the various associates function as a continuing unit," and (3) that "the enterprise exists separate and apart from the pattern of racketeering activity."[41]

The "ongoing organization" requirement is established by a showing that "some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual."[42]  The government may prove a "continuing unit" with evidence that each member of the enterprise "played a role in the [enterprise] that is both consistent with [its] organizational structure and furthered [its] activities."[43]

The separate existence requirement arises from the language of the statute itself, which requires that a RICO conspiracy violation be based on the existence of an enterprise *and* its planned pattern of racketeering activity.[44]  To prove separate existence, "it is not necessary to show that the

---

[41]*Id.* at 1266-67 (quoting *United States v. Sanders*, 928 F.2d 940, 943-44 (10th Cir. 1991)) (internal quotation marks omitted).  In *Smith*, the Tenth Circuit adopted the test found in the case of *United States v. Riccobene*, 709 F.2d 214 (3d Cir. 1983), *abrogation on other grounds recognized by United States v. Vastola*, 989 F.2d 1318, 1330 (3d Cir. 1993).

[42]*Riccobene*, 709 F.2d at 222.

[43]*Smith*, 413 F.3d at 1267.

[44]*See United States v. Turkette*, 452 U.S. 576, 583 (1981).

enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offences."[45] "The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement."[46]

Defendants argue that Count 1 of the Indictment should be dismissed because the government has not alleged specific facts outlining the structure and continuity of the Enterprise, and that the Enterprise, as alleged, has no existence separate from the predicate racketeering activities. On the contrary, the government contends that the structure and continuity of the Enterprise are not essential elements of a RICO conspiracy claim and therefore need not be affirmatively alleged, and that the Enterprise alleged in the Indictment has a separate existence from the predicate acts.

The Indictment in this case sufficiently alleges the first two elements of an enterprise by referring to the term's definition in 18 U.S.C. § 1961(4) and further explaining that the Enterprise "constituted an ongoing organization, whose members functioned as a continuing unit, for the common purpose of achieving the objectives of the enterprise."[47] This language alone likely satisfies any need for the government to allege the "ongoing organization" and "continuing unit" requirements of the "enterprise" element.[48] In this regard, it appears that Defendants have substituted

---

[45]*Smith*, 413 F.3d at 1267 (quoting *Riccobene*, 709 F.2d at 223-24) (internal quotation marks omitted).

[46]*Riccobene*, 709 F.2d at 224.

[47]Indictment ¶ 21 (Docket No. 1).

[48]*See United States v. Diaz*, 2006 WL 1833193, at *3-4 (N.D. Cal. Jun. 30, 2006) (unpublished order).

the requirements for proof at trial in place of the minimal constitutional standards for sufficiency of the Indictment.

Nonetheless, the Indictment also carefully identifies each of the Defendants as members of the Enterprise and alleges their individual roles therein as follows:[49] Baron Lombardo controlled the movement of gambling funds through credit card transactions via Gateway Technologies, which operated and maintained the Gateway website; Richard Carson-Selman was responsible to sell the payment processing services to the gambling websites; Tina Hill created and operated Hill Financial to provide the accounting services necessary to move and track the gambling funds; Henry Bankey supervised the creation of the accounting system; Count Lombardo managed and maintained the equipment on which the Gateway site was operated; and Kimberlie and Frank Lombardo managed the system through which the Western Union money wires were processed.

The Indictment also alleges the objects of the conspiracy: "to make money illegally by helping Internet gambling [websites] conduct their illegal business"; "to transfer the proceeds of its illegal operations into and out of the United States; to conceal its operations from the legitimate credit card companies, banks and wire transfer services it used; to conceal its operations from law enforcement agencies; and to evade the payment of federal taxes due to the United States from the [c]onspirators, their employees and agents."[50]

Although a much closer question, the Indictment also sets forth enough facts that, taken as true, would establish an enterprise separate from the alleged predicate acts. As the "enterprise" element is crucial to the statutory concept of RICO, the separate existence requirement merits some

---

[49]Indictment ¶¶ 5-11, 13-17, 21 (Docket No. 1).

[50]*Id.* at ¶ 4.

factual allegation beyond the mere tracking of the words of the statute or caselaw.  As set forth above, the Indictment has provided this detail.  In this case, Defendants organized multiple companies with significant infrastructure, including a technology company capable of "operating and maintaining a web site," as well as a functioning accounting firm.[51]  Additionally, the enterprise held bank accounts both within and without the United States and established a number of trusts.[52]  This substantial infrastructure, although not unrelated to the predicate offenses, existed apart from the actual commission of the predicate acts and was capable of being put to alternative legal and illegal uses separate from the alleged pattern of racketeering activity.  For example, this infrastructure could have been used to process payments for legitimate service operations or retail merchants, such as an online bookstore.  The enterprise presided daily over this infrastructure, using it to facilitate the commission of the predicate acts on an on-going basis "[b]eginning no later than sometime in 2000."[53]  Although this complex infrastructure was necessary for the commission of the alleged racketeering acts, it existed and was capable of functioning beyond the perpetration of the predicate acts.

### The Pattern of Racketeering Activity Element

Defendants argue that the government has failed to sufficiently allege the predicate acts that make up the "pattern of racketeering activity element" of a RICO conspiracy.  Specifically, Defendants point out that in Paragraph 24 of the Indictment the government refers to the underlying

---

[51] *Id.* at ¶¶ 13-15.

[52] *Id.* at ¶¶ 18-19.

[53] *Id.* at ¶ 21.

predicate acts only by statutory citation, which, according to defendants, "reache[s] new heights of vagueness."

A pattern of racketeering activity must consist of "at least two predicate acts . . . committed within ten years of another" that "are (1) related and (2) that . . . amount to or pose a threat of continued criminal activity."[54]  However, when the indictment alleges a RICO conspiracy charge under § 1962(d), as opposed to a substantive RICO charge under § 1962(c), it need not allege specific predicate acts committed by Defendants.[55]  This is so because the essence of the punishable offense under § 1962(d) is the agreement and not the underlying racketeering activity.[56]  As stated by the Seventh Circuit:

> If the government were required to identify, in indictments charging violation only of section 1962(d), specific predicate acts in which the defendant was involved, then a 1962(d) charge would have all of the elements necessary for a substantive RICO charge.  Section 1962(d) would thus become a nullity, as it would criminalize no conduct not already covered by sections 1962(a) through (c).  Such a result, quite obviously, would violate the statutory scheme in which conspiracy to engage in the conduct described in sections 1962(a) through (c) is itself a separate crime.[57]

Although the government must go beyond a generalized statement such as "the defendant engaged in various acts of bribery," "an indictment need only charge—after identifying a proper enterprise and the defendant's association with that enterprise—that the defendant knowingly joined a

---

[54]*Smith*, 413 F.3d at 1269 (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)) (internal quotation marks omitted).

[55]*United States v. Glecier*, 923 F.2d 496, 500-01 (7th Cir. 1991); *see also United States v. Crockett*, 979 F.2d 1204, 1209-10 (7th Cir. 1992).

[56]*Glecier*, 923 F.2d at 501.

[57]*Id.*

conspiracy the objective of which was to operate that enterprise through an identified pattern of racketeering activity."[58]

In this case, as Defendants are charged with only RICO conspiracy under § 1962(d) and not a substantive violation of RICO, the Indictment need not allege the predicate acts with the level of specificity as would be required in a separate substantive count for such acts.  Here the government carefully listed the statutes under which the predicate acts are alleged.   The government also descends to further detail in Paragraphs 25 through 34, which directly follow the heading "Manner, Method, and Means of the Racketeering Conspiracy."  In this section, the government discusses in detail the alleged "scheme" whereby the payment information of gamblers who wished to pay for online gambling using credit cards was forwarded to the Gateway where it was processed using incorrect classifications in order to disguise the gambling nature of the credit card charges.  The Indictment further discusses the manner in which money wires to the Philippines were used to disguise gambling payments.  It also alleges use of a system of banks and trusts through which the money was hidden and/or transferred to the gambling websites.  The indictment clearly sets forth sufficient detail to properly allege a pattern of racketeering acts.

Therefore, as the Court finds that the Indictment sufficiently alleges the elements of a RICO conspiracy under § 1962(d) challenged by Defendants, it will deny the RICO Motion.

### III. THE GATS MOTION

In the GATS Motion, Defendants ask the Court to dismiss the Wire Act counts and the RICO count, insofar as it is based on the Wire Act as a predicate act, arguing that recent decisions of the dispute resolution arm of the World Trade Organization bar prosecution of Defendants for

---

[58]*Id.* at 500-01.

facilitating online gambling protected under the General Agreement on Trade in Services ("GATS").

As a member of the WTO, the United States has agreed to multiple treaties, including GATS. Pursuant to GATS, the United States has made a series of commitments to allow foreign providers of services access to certain domestic markets. The United States has also agreed to the system of dispute resolution outlined in an agreement called the Dispute Settlement Understanding, which provides for the establishment of a panel to hear disputes and render reports, which are reviewable on appeal by the WTO's Appellate Body. The decisions of the Appellate Body become final unless the WTO Dispute Settlement Board reaches consensus otherwise.

Congress formally approved GATS in the Uruguay Round Agreements Act ("URAA") in 1994.[59] In the URAA, Congress addressed the "relationship of [the Uruguay Round Agreements] to United States law" and directed that "[n]o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect."[60] Additionally, the URAA makes clear that "[n]o person other than the United States . . . shall have any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement."[61]

Congress statutorily adopted a Statement of Administrative Action in the URAA, which is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question

---

[59] 19 U.S.C. § 3511(a), (d)(14).

[60] 19 U.S.C. § 3512(a)(1).

[61] 19 U.S.C. § 3512(c)(1)(A).

arises concerning such interpretation or application."[62]   The Statement clarifies a number of important issues regarding the interplay between domestic law and GATS, as well as the effect of decisions issued by WTO dispute resolution bodies.

A section of the Statement dealing with United States sovereignty states:

The WTO will have no power to change U.S. law.  If there is a conflict between U.S. law and any of the Uruguay Round agreements, section 102(a) of the implementing bill makes clear that U.S. law will take precedence . . . .  Moreover, as explained in greater detail in this Statement in connection with the Dispute Settlement Understanding, WTO dispute settlement panels will not have any power to change U.S. law or order such a change.  Only Congress and the Administration can decide whether to implement a WTO panel recommendation and, if so, how to implement it.[63]

A section of the Statement dealing with dispute resolution under the WTO states:

It is important to note that the new WTO dispute settlement system does not give panels any power to order the United States or other countries to change their laws. If a panel finds that a country has not lived up to its commitments, all a panel may do is recommend that the country begin observing its obligations.  It is then up to the disputing countries to decide how they will settle their differences.[64]

. . . .

Reports issued by panels or the Appellate Body under the [Dispute Settlement Understanding] have no binding effect under the law of the United States and do not represent an expression of U.S. foreign or trade policy. . . . If a report recommends that the United States change a federal law to bring it into conformity with a Uruguay Round agreement, it is for the Congress to decide whether any such change will be made.[65]

---

[62]19 U.S.C. § 3512(d).

[63]*The Uruguay Round Agreements Act: Statement of Admininstrative Action*, H.R. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4042 [hereinafter *Statement*].

[64]*Id.* at 4300.

[65]*Id.* at 4318.

In April of 2005, the Appellate Body of the WTO issued a decision regarding a dispute between Antigua and the United States in which Antigua claimed that the United States was in violation of its GATS commitments by making it unlawful for foreign providers to supply gambling and betting services to consumers within the United States.[66]  The Appellate Body upheld a panel decision finding that the United States had committed to allow foreign suppliers to access the United States market for gambling and betting services and that the Wire Act, and other federal laws regulating online gambling, violates the commitments of the United States under GATS.[67]

In their GATS Motion, Defendants contend that by carrying on this prosecution, the United States is in direct violation of its international obligations and that the Wire Act charges should therefore be dismissed because (1) the *Charming Betsy* cannon of construction and the principle of international comity dictate that the Court interpret the Wire Act and the URAA so as to not violate these obligations; and (2) the WTO's Appellate Body decision in the Antigua gambling case is self-executing and therefore binding upon this Court.

## A.  The Charming Betsy Canon and International Comity

Arising from the statements of Chief Justice John Marshall in the case of *Murray v. Schooner Charming Betsy*,[68] the *Charming Betsy* cannon of construction has come to stand for the proposition that "[w]here fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States."[69]  However,

---

[66]Appellate Body Report, *United States—Measures Affecting the Cross-Border Supply of Gambling and Betting Services*, ¶ 1 WT/DS285/R (April 7, 2005).

[67]*Id.* at ¶¶ 5, 373.

[68]6 U.S. (2 Cranch) 64 (1804).

[69]Restatement (Third) of Foreign Relations Law of the United States § 114 (1987).

26

the "*Charming Betsy* canon comes into play only where Congress's intent is ambiguous." "If a statute makes plain Congress's intent . . . then Article III courts, which can overrule Congressional enactments only when such enactments conflict with the Constitution, must enforce the intent of Congress irrespective of whether the statute conforms to customary international law."[70]

Likewise, the principle of international comity, when applied as a rule of statutory construction, "has no application where Congress has indicated otherwise."[71]

Defendants assert that this Court "may and must," under the *Charming Betsy* cannon and the principle of international comity, interpret the Wire Act to have neither extraterritorial reach nor application to online gambling. They also contend that the *Charming Betsy* cannon is an alternative ground to the Wire Act Motion's contention that § 1084(a) should be interpreted to apply only to sports betting. Lastly, Defendants argue that the URAA itself should be interpreted narrowly so as not to conflict with the commitments of the United States under GATS.

The clear language of both the Wire Act and the URAA entirely preclude any application of either the *Charming Betsy* cannon or the broader principle of international comity in this case. As an initial matter, the Indictment does not seek to apply the Wire Act to actions beyond the borders of the United States. Rather, the alleged conduct of Defendants was carried out within the United States. Specifically, each of the alleged wire communications either originated or terminated in the United States. However, even if extraterritorial conduct was at issue, the plain language of the Wire Act specifically contemplates such an application: "[w]hosoever . . . knowingly uses a wire communication facility for the transmission in interstate or *foreign* commerce of bets or wagers or

---

[70]*Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 135-36 (2d Cir. 2005) (quoting *United States v. Yousef*, 327 F.3d 56, 93 (2d Cir. 2003)) (citation omitted).

[71]*In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996).

information assisting in the placing or bets or wagers on a sporting event or contest . . . shall be fined under this title or imprisoned . . . ."[72]

With regard to the Wire Act's application to online gambling, at least two courts have already held that the Wire Act applies to this form of gambling.[73]  Moreover, the Wire Act itself, although enacted long before the advent of the Internet, clearly contemplates any form of electronic transmission via wire:

> The term 'wire communication facility' means any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writing, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission.[74]

Defendants' contention that the *Charming Betsy* cannon supports a narrow reading of § 1084(a), which reading would apply the prohibition on wire communications to only those communications related to sports betting, is misplaced.  Although the proffered interpretation would certainly help Defendants in this case, in order to avoid a conflict with the obligations of the United States under GATS, as interpreted in the Antigua case, the Wire Act could have no international application with regard to any form of online gambling, including sports-related gambling.

Finally, concerning Defendants' proffered URAA interpretation, Congress explicitly stated that "[n]o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall

---

[72]18 U.S.C. § 1084(a).

[73]*See United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *United States v. Corrar*, 2007 WL 196862 (N.D. Ga. Jan. 22, 2007).

[74]18 U.S.C. § 1081.

have effect."[75]  Furthermore, the Statement indicates that this statutory statement "clarifies that no provision of a Uruguay Round agreement will be given effect under domestic law if it is inconsistent with federal law, including provisions of federal law enacted or amended by the [URAA]."[76]  On its face, the URAA precludes precisely the argument raised by Defendants.

**B.  The Appellate Body Decision**

Defendants assert that the Appellate Body's Antigua decision is self-executing and that they may therefore rely on it to seek the dismissal of the allegations in the Indictment related to the Wire Act.  However, "WTO decisions are 'not binding on the United States, much less this court.'"[77] As indicated in the Statement of Administrative Action:

> Reports issued by panels or the Appellate Body under the DSU have no binding effect under the law of the United States and do not represent an expression of U.S. foreign or trade policy.  They are no different in this respect than those issued by GATT panels since 1947.  If a report recommends that the United States change a federal law to bring it into conformity with a Uruguay Round agreement, it is for the Congress to decide whether any such change will be made.[78]

Additionally, the URAA expressly forecloses "any cause of action or defense under any of the Uruguay Round Agreements" to persons other than the United States.[79]  Defendants have no standing to assert a defense based on the obligations of the United States under GATS.  A failure on the part of the United States to comply with a decision of the Appellate Body may give rise to WTO

---

[75]19 U.S.C. § 3512(a)(1).

[76]*Statement*, *supra* note 63, at 4050.

[77]*Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1348 (Fed. Cir. 2005) (quoting *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004)).

[78]*Statement*, *supra* note 63, at 4318.

[79]19 U.S.C. § 3512(c)(1)(A).

sanctions against the United States under GATS.  However, whether to accept those sanctions,

modify federal law, or renegotiate its GATS commitments[80] is a matter committed to the discretion

of Congress.  It is the Court's role to apply federal law to the case at hand as found in the Wire Act.

Any provision of GATS to the contrary "shall have [no] effect."[81]  Therefore the Court will deny the

GATS Motion.

## IV.  CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that Defendants' Motion to Dismiss Wire Act Counts (Counts 16-19)

[Docket No. 80] is DENIED.  It is further

ORDERED that Defendants' Motion to Dismiss Count One (RICO Conspiracy) [Docket

No. 78] is DENIED.  It is further

ORDERED that Defendants' Motion to Dismiss Based on Treaty Obligations and

Domestic and International Law (Counts 1, 16-19) [Docket No. 79] is DENIED.

DATED December 13, 2007.

BY THE COURT:

_____

TED STEWART
United States District Judge

---

[80]The United States has apparently elected the last option: "In light of these developments
in the WTO dispute, the United States has decided to make use of the established WTO
procedures to correct its schedule in order to reflect the original U.S. intent — that is, to exclude
gambling from the scope of the U.S. commitments under the GATS." Press Release, Office of
United States Trade Representative, Statement of Deputy United States Trade Representative
John K. Veroneau Regarding U.S. Actions under GATS Article XXI (May 5, 2007), *available at*
http://www.ustr.gov/Document_Library/Press_Releases/Section_Index.html.

[81]*See* 19 U.S.C.§ 3512(a)(1).