IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>BARON LOMBARDO, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR *FRANKS* HEARING<br><br><br><br>Case No. 2:07-CR-286 TS |

This matter is before the Court on Defendant Baron Lombardo's Motion for *Franks*

Hearing in which Defendants Carson-Selman, Hill, and Count Lombardo have joined.

Defendants move the Court to conduct a hearing pursuant to *Franks v. Delaware*[1] to determine

whether two search warrants executed in Las Vegas, Nevada in May 2007 must be voided, and

the fruits thereof excluded, due to alleged false statements and material omissions in the

underlying warrant affidavits.  As explained below, the Court will deny the Motion because

Defendants have not made a substantial showing that the affiants knowingly and intentionally, or

with reckless disregard, included false statements in or omitted material information from their

---

[1]438 U.S. 154 (1978).

respective warrant affidavits and that these false statements or omissions affected the probable cause determination upon which the search warrants were issued.

## I. BACKGROUND

On May 9, 2007, a grand jury returned a thirty-four count Indictment charging Defendants with conspiring in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), committing bank fraud, transmitting wagering information in violation of the Wire Act,[2] and laundering money.  On October 19, 2007, two motions to suppress were filed.

Defendant Carson-Selman filed a Motion to Quash and Suppress Evidence, asking the Court to quash a search warrant issued on May 9, 2007, which authorized the search of a business premises located on Desert Lane in Las Vegas, Nevada, and to suppress the evidence seized pursuant to its execution.  Defendants Baron Lombardo, Hill, Count Lombardo, and Bankey[3] joined the Desert Lane Motion.

Defendant Baron Lombardo filed a Motion to Suppress Evidence, seeking to suppress the evidence obtained by the search of his residence located on a street named Plaza Del Grande in Las Vegas, Nevada, conducted by federal agents pursuant to a search warrant issued on May 11, 2007.  Defendants Carson-Selman, Hill, and Count Lombardo joined the Plaza Del Grande Motion.

An evidentiary hearing was held on the two motions to suppress on November 29, 2007, in which the Government called a single witness.  The Court ordered that Defendants file their

---

[2]18 U.S.C. § 1084(a).

[3]Defendant Bankey withdrew his joinder in the Desert Lane Motion at the November 29, 2007 hearing.

memoranda regarding the motions to suppress by January 14, 2008.  However, instead of filing briefs on the motions to suppress, Defendants filed the Motion for *Franks* Hearing.

In their Motion for *Franks* Hearing, Defendants challenge both the Desert Lane search warrant and the Plaza Del Grande search warrant.

## II.  DISCUSSION

In *Franks v. Delaware*,[4] the Supreme Court held that a defendant may, in certain circumstances, "challenge the truthfulness of factual statements made in an affidavit supporting [a search warrant]."[5]  However, a defendant is entitled to an evidentiary hearing under *Franks* only upon making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."[6] Upon such a showing, a defendant must then establish by a preponderance of the evidence at the *Franks* hearing that the false information is indeed the product of the affiant's perjury or reckless disregard and that without it the affidavit is insufficient to establish probable cause.[7]  If the defendant meets this burden, the search warrant "must be voided and the fruits of the search

---

[4]438 U.S. 154 (1978).

[5]*Id.* at 155.

[6]*Id.* at 155-56.

[7]*Id.* at 156.

3

excluded."[8]  Notably, the Tenth Circuit has extended the *Franks* framework "to material omissions, as well as affirmative falsehoods."[9]

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."[10]  After all, the warrant affidavit enjoys a "presumption of validity."[11]  Accordingly, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false" and offer a "statement of supporting reasons."[12]  These allegations should be supported by "an offer of proof" in the form of "[a]ffidavits or sworn or otherwise reliable statements of witnesses" or an explanation as to their absence.[13]  Then, even upon a showing of perjury or reckless disregard, if the false statements or omissions of which the defendant complains would not alter the probable cause determination, the defendant is not entitled to a *Franks* hearing.[14]  "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the 'fair probability that contraband or evidence of a crime will be found in a particular place.'"[15]

---

[8]*Id.*

[9]*United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (quoting *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990)) (internal quotation marks omitted).

[10]*Franks*, 438 U.S at 171.

[11]*Id.*

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]*United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005) (quoting *United States v. Rice*, 358 F.3d 1268, 1274 (10th Cir. 2004)).

4

Defendants challenge both the Desert Lane search warrant and the Plaza Del Grande search warrant, claiming that the affidavits submitted in application for these warrants contain material false statements and omissions.

*1. Desert Lane Warrant*

Special Agent Hipwell submitted a warrant affidavit in application for a warrant to search the premises located at the Desert Lane address.  The following is a brief summary of its content:

In his affidavit, Agent Hipwell outlines an extensive criminal investigation that began in February 2006 when "three former employees of two businesses, Hill Financial Services and Gateway Technologies, both located in Draper, Utah," met with IRS investigators in Salt Lake City.  These three former employees, along with seven of their colleagues (the "Cooperating Witnesses") detailed to investigators how the "Targets," including each of the Defendants in this case, used Hill Financial, Gateway Technologies, and a number of other entities, to operate an enterprise that facilitated the processing of illegal Internet gambling transactions.  More specifically, by use of a website called the "Gateway," owned by Gateway Technologies and housed on server space rented from an entity called "Rackspace" in England, Defendants processed gambling transactions for third-party gambling websites.  In essence, when persons wished to gamble at one of the third-party websites, they submitted credit card payment information to the third-party website in order to fund gambling accounts.  That information was relayed to the Gateway, where the transactions were disguised as purchases of goods or services not involving gambling and then processed through offshore banks.  When cleared through a series of transfers to offshore banks, the payment funds were remitted to the third-party gambling websites, less a fee charged by the Defendants for their services.  The Gateway also processed

gambling transactions for third-party websites via wire transfers to Western Union offices in the Philippines.

According to the Cooperating Witnesses, after their employment ceased, Hill Financial and Gateway Technologies moved to the Desert Lane address. After conducting surveillance of the Desert Lane address, including multiple trash runs and a first-hand identification of Defendant Baron Lombardo, which corroborated the Cooperating Witnesses' claim that Hill Financial and Gateway Technologies were conducting operations from the Desert Lane address, Agent Hipwell applied for a warrant to search the premises for fruits or instrumentalities of the alleged criminal enterprise. Based on Agent Hipwell's affidavit, Magistrate Judge Foley of the United States District Court for the District of Nevada issued a search warrant.

In their *Franks* Motion, Defendants contend that Agent Hipwell knowingly or with reckless disregard made a number of false statements in, and omitted material information from, the affidavit he submitted in connection with his application for the Desert Lane search warrant. Each of Defendants' allegations are considered below within the *Franks* framework.

        a.  False Statements

Defendants point to a number of statements included by Agent Hipwell in his affidavit, which they claim are false. The substance of these statements is summarized as follows: (1) Defendant Count Lombardo was the only individual in possession of the password necessary to access and make changes to the server space rented from Rackspace; (2) Hill Financial and Gateway Technologies existed in 2002 and employed Cooperating Witness 1 and Cooperating Witness 2 as supervisors; (3) Defendant Bankey was employed by Hill Financial; (4) Cooperating Witness 1 and his fellow employees were not told that the transactions processed by

the Gateway involved gambling; and (5) the Gateway miscoded credit card transactions to appear as purchases of goods and services not involving gambling.

With regard to Number 1, Defendants have not proffered any evidence to the Court that can establish that persons other than Defendant Count Lombardo had the password necessary to access the Rackspace server.  Defendants take issue with the following statement in Agent Hipwell's affidavit: "Count Lombardo was the only individual who had the password necessary to access and make changes to the Gateway servers."[16]  Claiming that this statement is false, Defendants point to the following statement found in an investigative report of a witness interview held on February 27, 2007, at which Agent Hipwell was present: "[Cooperating Witness 6] had heard that the password was something like 'Count's the best' or [']Count's #1.'"[17]  However, the sentence directly before this one in the investigative report reads, "COUNT had the only password that allowed them to get into Rackspace."[18]  Agent Hipwell's statement is clearly consistent with the substance of the February 27, 2007 investigative report.

Defendants also claim that in an interview with Cooperating Witness 1, Agent Hipwell learned that "[Cooperating Witness 1] and [Cooperating Witness 8] were given access to control Rockspace [sic]."[19]  However, this statement, found in another investigative report, in reality reads: "Through COUNT'S approval, [Cooperating Witness 1] and [Cooperating Witness 8]

---

[16]Docket No. 125 Ex. A, at 7:4-5.

[17]Docket No. 147-4, at ¶ 7.

[18]*Id.*

[19]Docket No. 147, at 2.

were given access to *contact* Rackspace."[20]  The substance of the paragraph from which this statement was taken makes clear that Cooperating Witness 1 and Cooperating Witness 8 were placed on the "call list," which allowed them to call Rackspace by telephone.  It does not indicate that they were given the password necessary to access the server space housing the Gateway. Accordingly, Defendants have not met the substantial showing requirement with respect to Number 1.

Likewise, with regard to Number 2, Defendants have not brought forth any evidence to indicate that Hill Financial and Gateway Technologies were not operating as of 2002. Defendants point to statements in Agent Hipwell's affidavit in which he indicates that Hill Financial was not incorporated until 2004 and Gateway Technologies did not legally come into existence until CurrenC, LLC's name was changed in 2004.  From this, Defendants contend that Hill Financial and Gateway Technologies were not operating in 2002 and, therefore, could not have hired Cooperating Witness 1 and Cooperating Witness 2 in 2002.  However, simply because these entities did not enjoy their current legal status until 2004 does not mean that they did not exist and operate in 2002, albeit in a different legal form.  Nor does it follow that they could not have hired Cooperating Witness 1 and Cooperating Witness 2 in 2002.  Notably, Agent Hipwell's affidavit is internally contradictory as to whether Cooperating Witness 2 was hired in 2002 or 2004.  However, this fact has no bearing on whether Agent Hipwell's affidavit established a fair probability that the Defendants were engaged in a criminal enterprise and that fruits or instrumentalities of that enterprise would be found at the Desert Lane address. Accordingly, Defendants have not met their *Franks* burden with respect to Number 2.

---

[20]Docket No. 159 Ex. A, at ¶ 9 (emphasis added).

8

Concerning Number 3, Defendants offer the affidavit of Defendant Hill in which she states that Defendant Bankey "was never an employee of Hill Financial Services, Inc."[21]  Even assuming that this is true, and, therefore, that Agent Hipwell's statements regarding Defendant Bankey's employment with Hill Financial were false, Defendants have provided no evidence to show that Agent Hipwell knew that his statements were false or that he acted with reckless disregard.  Furthermore, even if these allegedly false statements were excised from Agent Hipwell's affidavit, the remaining content would easily establish probable cause.  Thus, Defendants have not met the substantial showing requirement with respect to Number 3.

Concerning Number 4, even assuming that the Cooperating Witnesses were fully aware from the outset of their employment that the Gateway was processing gambling transactions, this information does not affect the determination of probable cause upon which the Desert Lane search warrant was issued.  If this information was excised from Agent Hipwell's affidavit, or for that matter if his affidavit made clear that the employees knew what they were getting into by accepting employment with Hill Financial or Gateway Technologies, the affidavit would still easily demonstrate a fair probability that the targets were involved in a criminal enterprise to fraudulently facilitate the processing of illegal gambling transactions and that fruits or instrumentalities of the enterprise would be found at the Desert Lane address.  Accordingly, Agent Hipwell's alleged false statement regarding the Cooperating Witnesses' understanding of the Gateway business cannot satisfy the substantial showing requirement.

Lastly, although Number 5 warrants more discussion, Defendants have not made a substantial showing that the Gateway did not miscode credit card transactions and that Agent

---

[21]Docket No. 157, at ¶ 3.

Hipwell knew that the Gateway did not miscode credit card transactions.  Agent Hipwell's affidavit contains the following statement: "The Gateway would automatically transfer the gambler's information to the bank that issued the gambler's credit card, but would mis-code the transaction as a purchase of goods or services not involving gambling."[22]  Defendants have introduced the expert opinion testimony of Mr. Cliff Gray that per Visa and MasterCard operating rules, acquiring banks alone are responsible for assigning Merchant Category Codes (MCC) to specific transactions.  Mr. Gray indicates that the acquiring bank must use the MCC "within the stored merchant profile during authorizations submitted to the issuer via interchange" and that the transaction protocols "do not support MCC codes inbound to the acquirer or processor."[23]  From Mr. Gray's somewhat truncated testimony, it appears that when a merchant initiates a credit card transaction, the acquiring bank—*i.e.*, the merchant's bank—receives the transaction information from the merchant, attaches the MCC associated with the merchant, and forwards the transaction information to the cardholder's bank for payment.

Agent Hipwell's affidavit testimony concerning the alleged miscoded transactions is not inconsistent with Mr. Gray's testimony in this regard.  Agent Hipwell says nothing about Merchant Category Codes.  Rather, he asserts that the Gateway "would mis-code the transaction as a purchase of goods or services not involving gambling."[24]  Shortly below this statement in his affidavit, Agent Hipwell explains:

> The Targets used Merchant Identification Numbers ("MID") assigned to
> businesses they controlled in order to facilitate the Internet gambling credit card

___

[22]Docket No. 125 Ex. A, at 7:15-19.

[23]Docket No. 147 Ex. 2.

[24]Docket No. 125 Ex. A, at 7:15-19.

transactions.  A MID is required by Visa, MasterCard and their issuing banks.
Financial institutions that issue credit cards will not process transactions without
an associated MID.  The Targets had one MID assigned to CurrenC Worldwide
Ltd of Korea (Mallpay).  The Targets also used a MID assigned to a business
located in Florida called Paper & Clips, and other MID numbers assigned to
businesses located overseas.[25]

In other words, the transactions were not miscoded using MCCs, but rather using MIDs.

By using MIDs from merchants other than the gambling website clients, the Gateway was able to

disguise a gambling transaction as one for the purchase of goods and services.  Thus, Defendants

have not even made a substantial showing that Agent Hipwell's statement concerning the

miscoded transactions is false, let alone that Agent Hipwell included the statement with reckless

disregard as to its truth.  To the contrary, the government has shown that Agent Hipwell's

statement is consistent with the underlying investigative reports.  Accordingly, Defendants have

not satisfied the substantial showing requirement with regard to Agent Hipwell's transaction

miscoding statement.

        b.  Alleged Omissions

Defendants also claim that Agent Hipwell omitted the following information from his

affidavit: (1) the Cooperating Witnesses allegedly misappropriated the intellectual properties of

Gateway Technologies and Hill Financial to begin a competing business; and (2) the Cooperating

Witnesses employment with Gateway Technologies and Hill Financial ended in October 2005.

With respect to the misappropriation allegations, Agent Hipwell clearly disclosed this

information in his affidavit:

The Targets sued the Cooperating Witnesses for alleged violations of their
employment agreements, misappropriations of intellectual property and
embezzlement.  Generally, the Targets claim that the Cooperating Witnesses

---

[25]*Id.* at 8:4-12.

violated their employment agreements with Gateway Technologies and Hill Financial Services, misappropriated trade secrets and fraudulently operated their own "payment processing gateway" using Gateway Technologies and Hill Financial Services equipment and proprietary software.  According to the Cooperating Witnesses, that litigation is close to being settled, with no damages on either side, and each side paying its own litigation costs.[26]

With respect to the termination, Defendants complain that Agent Hipwell failed to mention that the Complaining Witnesses's employment relationship with Hill Financial and Gateway Technologies ended in October of 2005, thus creating "a time line . . . that implies that all activities are occurring during the time period from March 30, 2006 to March 19, 2007."[27] From this, Defendants argue that "all of the information from the [C]ooperating [W]itnesses was at least 19 months old and the magistrate should have been informed of that fact."[28]

Indeed, Agent Hipwell does fail to mention that the Cooperating Witnesses' employment was terminated in October 2005.  However, the affidavit makes clear that at least three of the Cooperating Witnesses were "former employees" as of February 2006.[29]  The affidavit also states that the Cooperating Witnesses left their employment "en mass," implying that they had all left as of February 2006.  Thus, Agent Hipwell's omission of the actual date that the Cooperating Witnesses' employment was terminated caused, at most, a four to five month discrepancy as to when the Cooperating Witnesses actually left their employment.

In light of other corroborating information contained in Agent Hipwell's affidavit, this four to five month discrepancy does not affect the probable cause determination.  According to

---

[26]*Id.* at 11:15-23.

[27]Docket No. 147, at 6.

[28]*Id.*

[29]Docket No. 125 Ex. A, at 3:3-10.

the Cooperating Witnesses, after their employment was terminated, Hill Financial and Gateway

Technologies moved to the Desert Lane address.  This was corroborated with information that a

copier leased to Hill Financial was moved to that address on March 30, 2006.  Agent Hipwell

states that the Cooperating Witnesses had some contact with the Defendants after their

employment relationship was terminated and that based upon these contacts, the Cooperating

Witnesses believed that the Defendants were continuing to facilitate gambling in the United

States.[30]  Agent Hipwell conducted a trash run at the Desert Lane address on October 16, 2006,

and found the following:

> phone lists for Hill Financial Services and Gateway Technologies, including the
> personal phone numbers of most of the Targets, Korea Exchange bank
> reconciliations of accounts held by the Targets, Hill Financial Services and
> Gateway Technologies general ledger report excerpts, CurrenC Worldwide client
> invoices, an Antigua Overseas Bank envelop, and a cash reconciliation showing
> the balances of some bank accounts (both offshore and domestic) held by the
> Targets and/or business entitles used by the Targets.[31]

Another trash run at the Desert Lane address on March 19, 2007, revealed pages from the

accounts payable ledgers of both Hill Financial and Gateway Technologies.  These trash runs did

not yield documents attributable to other businesses.  During surveillance conducted on March

27, 2007, and March 28, 2007, Agent Hipwell observed several cars in the parking lot at the

Desert Lane address, including a BMW registered to Hill Financial, a Mercedes-Benz registered

to Defendant Carson-Selman, a Maserati registered to an entity controlled by Defendant Baron

Lombardo, and a GMC registered to a known employee of Gateway Technologies.  In a final

trash run on April 23, 2007, IRS agents discovered mail addressed to Hill Financial, Gateway

---

[30]*Id.* at 28:21-25.

[31]*Id.* at 28:14-20.

Technologies, Defendant Baron Lombardo, Defendant Hill, and to a known employee of Gateway Technologies, as well as statements reflecting the accounts payable of Gateway Technologies and a letter to Defendant Carson-Selman about his lost or stolen baggage.  Based on all of this evidence contained in Agent Hipwell's affidavit, even if the affidavit clearly stated that the Cooperating Witnesses left the employ of Hill Financial and Gateway Technologies in October of 2005, there was still a fair probability that fruits or instrumentalities of the Defendants' alleged illegal enterprise would be located at the Desert Lane address.  Accordingly, the failure to include this information in the affidavit would not have affected the probable cause determination.

In sum, Defendants have not made a substantial preliminary showing that Agent Hipwell knowingly and intentionally, or with reckless disregard, made false statements in, or omitted material information from, his warrant affidavit that would affect the probable cause determination upon which the Desert Lane search warrant was issued.  Consequently, the Court will deny the Motion for *Franks* Hearing with respect to the Desert Lane search warrant.

   *2. Plaza Del Grande Warrant*

Special Agent Hill submitted an affidavit in support of an application for a warrant to search the residence of Defendant Baron Lombardo located on a street called Plaza Del Grande in Las Vegas, Nevada.[32]  Notably, Agent Hill's affidavit incorporates the affidavit of Agent Hipwell, stating that the Hipwell affidavit outlines the investigation into Defendants' alleged criminal activity.  The following is a brief summary of the content of the Hill affidavit:

_____

   [32]In his warrant affidavit, Agent Hill describes the property as located on a street named "Plaza Grande" instead of street named "Plaza Del Grande."  Defendants have not objected to this statement on *Franks* grounds, nor would it affect the probable cause determination.

On the morning of May 10, 2007, the day after Defendants were indicted and the Desert Lane search warrant was issued, Agent Hill accompanied personnel from the U.S. Marshals Service to the Plaza Del Grande address to execute an arrest warrant for Defendant Baron Lombardo. A U.S. Marshal jumped an exterior fence into a courtyard area and knocked on the door. Defendant Baron Lombardo's girlfriend, Ms. Bassler, answered the door and invited agents into the residence. She informed the agents that Defendant Baron Lombardo was not home, but that she would call him.

Agent Hill did not initially accompany the agents into the house. A few minutes after their initial entry, one of the Marshals came out and informed Agent Hill that there were a number of computers inside the home. As Agent Hill entered the courtyard, but before entering the house, he was able to see several computers in the house through a window. According to Agent Hill, Ms. Bassler gave him permission to look in the room containing the computers. In the room there were three or four desks each with a computer or some type of electronic equipment thereon as well as a server located in a "nook." Agent Hill spoke with Defendant Baron Lombardo on the phone, asking for consent to remove the computers, which Defendant Lombardo declined.

Federal agents maintained surveillance of the residence for much of the rest of the day, with Ms. Bassler allowing them into the courtyard area or the interior of the home (specifically the room where the computers were located) on at least two occasions. During these times, agents observed two additional computers, an additional server, and a laptop in the room housing the computers observed by Agent Hill.

Based on information received from Senior Special Agent McDermott, with whom Agent Hipwell had discussed the facts of the investigation, Agent Hill states that at some point prior to

15

renting server space with Rackspace, the Gateway website was housed on a server located at Defendant Baron Lombardo's home.  Additionally, Agent Hill indicates that a server found during the search of the Desert Lane address allowed remote access, potentially utilized by Defendant Baron Lombardo from the computers in his home.  On May 11, 2007, Magistrate Judge Foley issued a warrant to search the Plaza Del Grande residence.

In their Motion for *Franks* Hearing, Defendants claim that Agent Hill knowingly and intentionally included false statements in his warrant affidavit.

   a. Standing

As a preliminary matter, the Government challenges the standing of Defendants Carson-Selman, Hill, and Count Lombardo to object to the search of the Plaza Del Grande residence. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."[33]

The premises located at the Plaza Del Grande address is the personal residence of Defendant Baron Lombardo.  None of the other Defendants has alleged anything in the briefing related to either the motions to suppress or the Motion for *Franks* Hearing that would establish that they had a reasonable expectation of privacy in Defendant Baron Lombardo's private residence.  Accordingly, the Court finds that Defendants Carson-Selman, Hill, and Count Lombardo may not challenge the Plaza Del Grande search warrant.

---

[33]*Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

b.  False Statements

Defendant Baron Lombardo claims generally that "[t]he affidavit of Agent Hill is false in its entirety and misrepresents the facts as they occurred on the day in question."[34]  However, this general assertion does not satisfy Defendant Lombardo's burden to make a substantial preliminary *Franks* showing.  As stated by the *Franks* Court, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false" and offer a "statement of supporting reasons."[35]

Defendant Lombardo specifically challenges only Agent Hill's statements regarding the federal agents' initial and subsequent entries into the Plaza Del Grande residence with Ms. Bassler's permission, citing Ms. Bassler's affidavit in which she states that she never freely gave permission for federal agents to be in the home.

The Government contends that Ms. Bassler's consent to enter the Plaza Del Grande residence is irrelevant to the *Franks* analysis because the federal agents observed the computers while legally present regardless of Ms. Bassler's consent and because the eventual search of the computers was not based on Ms. Bassler's consent, but on the search warrant issued by Magistrate Judge Foley.  According to the Government, agents were legally present in the Plaza Del Grande residence while attempting to execute a warrant for Defendant Baron Lombardo's arrest.  To the extent that they remained in or re-entered the Plaza Del Grande residence after it was determined that Defendant Lombardo was not there, the Government contends that the

---

[34]Docket No. 147, at 7.

[35]*Franks*, 438 U.S. at 171.

agents' presence was justified by the imminent danger that evidence stored on the computers might be destroyed.

Mere observation of evidence does not implicate the Fourth Amendment where the observing officer was "lawfully in a position from which he can view the object."[36]  Officers may lawfully enter the residence of a suspect in order to execute a valid warrant for his arrest "when there is reason to believe the suspect is within."[37]  Additionally, a warrantless entry to prevent the destruction of evidence is permitted where such entry is "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."[38]

Even assuming that Ms. Bassler at no time gave consent to enter the Plaza Del Grande residence, the agents who initially entered in an attempt to execute the warrant for Defendant Baron Lombardo's arrest were lawfully present when they observed "a number of computers in the home."[39]  Thus, their observations, made while legally present could form the basis of a probable cause determination.  As outlined in Agent Hipwell's affidavit—which was attached to and incorporated in Agent Hill's affidavit—the Defendants were being investigated for a criminal enterprise involving the fraudulent processing of credit card transactions for illegal Internet gambling.  These transactions were processed through the Gateway, an Internet website.

---

[36]*United States v. Cruz-Mendez*, 467 F.3d 1260, 1266 (10th Cir. 2006).

[37]*See Payton v. New York*, 445 U.S. 573, 603 (1980).

[38]*United States v. Carter*, 360 F.3d 1235, 1241 (10th Cir. 2004) (quoting *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1997)).

[39]Docket No. 162 Ex. A, at 3:13-15.

Agent Hill's affidavit contains information that at some point the Gateway website was housed on a computer server located at Defendant Baron Lombardo's home.  The affidavit further specifies that a server located at the Desert Lane address allowed for remote access by other computers.  Even if all of the statements regarding Ms. Bassler's consent were excised from Agent Hill's affidavit, its remaining contents would still have been sufficient to support Magistrate Judge Foley's probable cause determination.  Accordingly, the Court will deny the Motion for *Franks* Hearing with respect to the Plaza Del Grande search warrant.

Because the federal agents' initial observations of the computers were sufficient to support probable cause, the Court need not determine whether the agents' continued presence and subsequent re-entries into the Plaza Del Grande residence were justified such that Magistrate Judge Foley could have relied on observations made during these times.

### III.  CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that Defendants' Motion for *Franks* Hearing [Docket No. 147] is DENIED. It is further

ORDERED that Defendants shall file their memoranda on the Motions to Suppress [Docket Nos. 74 and 77] on or before April 11, 2008, and that the Government shall file its responses on or before April 28, 2008.

DATED March 27, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge

19