IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>vs.<br><br><br>BARON LOMBARDO, et al.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS<br><br><br><br><br><br>Case No. 2:07-CR-286 TS |

This matter is before the Court on Defendants' Motions to Suppress. For the reasons set forth below, the Court will deny both Motions.

I.  PROCEDURAL HISTORY

On October 19, 2007, Defendant Carson-Selman filed a Motion to Quash and Suppress Evidence, asking the Court to quash a search warrant issued on May 9, 2007, which authorized the search of a business premises located on Desert Lane in Las Vegas, Nevada, and to suppress the evidence seized pursuant to its execution. Defendants Baron Lombardo, Hill, Count Lombardo, and Bankey joined the Desert Lane Motion. Defendant Bankey has since withdrawn.

On the same day, Defendant Baron Lombardo filed a Motion to Suppress Evidence, seeking to suppress the evidence obtained by the search of his residence located on a street named Plaza Del Grande in Las Vegas, Nevada, conducted by federal agents pursuant to a search

1

warrant issued on May 11, 2007. Defendants Carson-Selman, Hill, and Count Lombardo joined the Plaza Del Grande Motion.

An evidentiary hearing was held on the two Motions to Suppress on November 29, 2007. The Court ordered that Defendants file their memoranda regarding the Motions to Suppress by January 14, 2008. Instead of filing briefs on the Motions to Suppress, Defendants filed a Motion for *Franks*[1] Hearing. In an Order dated March 27, 2008, the Court denied Defendants' Motion for *Franks* Hearing and set a new briefing schedule for the Motions to Suppress.[2] The Parties timely submitted their memoranda and the Motions to Suppress are now ripe for decision.

## II. DISCUSSION

In their Motions to Suppress, Defendants challenge both the Desert Lane warrant and the Plaza Del Grande warrant, claiming that the affidavits upon which the warrants issued were insufficient to support the Magistrate Judge's probable cause determination.

When reviewing a challenge to the sufficiency of a warrant affidavit, the magistrate judge's determination that the affidavit establishes probable cause to issue a search warrant "is entitled to 'great deference.'"[3] Accordingly, the Court "ask[s] only whether the issuing magistrate had a substantial basis for determining probable cause existed."[4]

"An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the 'fair probability that contraband or evidence of a crime

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978).

[2] Docket No. 163.

[3] *United States v. Le*, 173 F.3d 1258, 1265 (10th Cir. 1999) (quoting *United States v. Wittgenstein*, 163 F.3d 1164, 1172 (1998)).

[4] *Id.* (quoting *Wittgenstein*, 163 F.3d at 1172) (internal quotation marks omitted).

will be found in a particular place.'"[5] Notably, the affidavit need not make "a prima facie showing of each and every element of the crime, but only a probability that a federal crime has been committed or is being committed."[6] Yet, the "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause."[7] Conclusory allegations will not suffice in this regard.[8]

Likewise, information that has grown stale cannot support a finding of probable cause.[9] "The determination of timeliness, however, does not depend on simply the number of days that have elapsed between the facts relied on and the issuance of the warrant; instead, whether the information is too stale to establish probable cause depends on 'the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.'"[10] "Where the offense in question is ongoing and continuing, the passage of time is not of critical importance."[11] And, otherwise stale information "may be refreshed by more recent events."[12]

---

[5] *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005) (quoting *United States v. Rice*, 358 F.3d 1268, 1274 (10th Cir. 2004)).

[6] *United States v. Sevier*, 539 F.2d 599, 602 (10th Cir. 1976).

[7] *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

[8] *Id.*

[9] *United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005).

[10] *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990) (quoting *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986)).

[11] *United States v. Jardine*, 364 F.3d 1200, 1205 (10th Cir. 2004) *vacated on other grounds* 543 U.S. 1102 (2005).

[12] *Cantu*, 405 F.3d at 1177-78.

In making the "practical, common-sense decision" as to whether probable cause has been shown, the magistrate judge may consider hearsay statements made by a confidential informant.[13] An informant's statements are evaluated under the "totality-of-the-circumstances" test.[14] The informant's "veracity, reliability and basis of knowledge are all highly relevant in determining the value of his report."[15] "However, a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."[16]

With this legal framework in place, the Court now considers the sufficiency of the affidavits underlying the Desert Lane and Plaza Del Grande warrants.

A.  Desert Lane Warrant

Special Agent Hipwell submitted a sworn affidavit in support of the Desert Lane warrant in which he asserted probable cause that Defendants had "conducted a racketeering enterprise in violation of Title 18, U.S.C. § 1962(d), defrauded financial institutions in violation of Title 18, U.S.C. § 1344, aided and abetted the transmission of wagers and wagering information in violation of Title 18, U.S.C. § 1084, used facilities in interstate commerce in violation of Title 18, U.S.C. § 1952, and laundered money in violation of Title 18, U.S.C. §§ 1956 and 1957 . . .

---

[13]*Gates*, 462 U.S. at 238.

[14]*Id.*

[15]*Id.* at 230 (internal quotation marks omitted).

[16]*United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting *Gates*, 462 U.S. at 233).

[and] that evidence, fruits and instrumentalities of these crimes [would] be found at [the Desert Lane address]."[17]

Defendants contend that Agent Hipwell's affidavit does not adequately explain how the conduct alleged therein violated the listed statutes and that the affidavit does not contain any timely and corroborated facts connecting the alleged illegal activity with the Desert Lane address. Accordingly, Defendants argue that "there was insufficient probable cause to issue the search warrant for the Desert Lane business premises for evidence, fruits and instrumentalities of the crimes alleged in the affidavit and search warrant."[18]

The following is a summary of the thirty-page affidavit's content: In his affidavit, Agent Hipwell outlines an extensive criminal investigation that began in February 2006 when "three former employees of two businesses, Hill Financial Services and Gateway Technologies, both located in Draper, Utah," met with IRS investigators in Salt Lake City. These three former employees, along with seven of their colleagues (the "Cooperating Witnesses") detailed to investigators how the "Targets," including each of the Defendants in this case, used Hill Financial, Gateway Technologies, and a number of other entities, to operate a business that facilitated the processing of illegal Internet gambling transactions. More specifically, by use of a website called the "Gateway," owned by Gateway Technologies and housed on server space rented from an entity called "Rackspace" in England, Defendants processed gambling transactions for third-party gambling websites. The Gateway offered two payment processing options: credit card payments and Western Union wire transfers.

---

[17]Docket No. 125 Ex. A, at 30.

[18]Docket No. 167, at 16.

When patrons wished to use a credit card to fund a wagering account with a gambling website client of the Gateway, they submitted credit card payment information on the client's website which was relayed to the Gateway. The Gateway then processed the credit card transactions, disguising them as purchases of goods or services not involving gambling. The Targets used a South Korean bank by the name of LG Card to act as the acquiring bank for the credit card transactions. Based on the instructions of the Targets, LG Card would transfer the credit card proceeds immediately after receiving them to an account at Korea Exchange Bank[19] controlled by the Targets. The proceeds were then transferred to an account controlled by the Targets at First Global Bank in Jamaica, from which the proceeds were remitted to the third-party gambling websites, less a fee charged by the Defendants for their services. To ensure that the miscoded credit card transactions would be processed, the Targets paid a percentage fee based on the money transacted through LG Card to Dong Sun Cho, an LG Card representative. Mr. Cho was introduced to the Targets by a former New Jersey Congressman. In an interview with government agents, the Congressman confirmed that he had introduced the Targets to Mr. Cho for the purpose of processing credit card transactions, which he later learned were intended to fund Internet wagering accounts. Between July 8, 2004, and May 31, 2005, the Gateway processed approximately $151,622,578 in credit card payments through LG Card.

When patrons selected the Western Union payment option, their information was likewise forwarded to the Gateway. The patrons were instructed to wire money to one of several Western Union offices in the Philippines where it would be collected by an agent of the Targets. The

---

[19]This bank is referred to in Agent Hipwell's affidavit as both "Korea Exchange Bank" and "Korean Exchange Bank." For ease of reference, it shall be referred to in this Order as Korea Exchange Bank.

Gateway would then notify the client website of each payment's receipt.  The Philippines agent subsequently wired the funds to one of the Target's multiple off-shore accounts.

      The Cooperating Witnesses provided agents with business records created and maintained during an 18 to 24 month period of their employment with Gateway Technologies/Hill Financial. "These records included spreadsheets of wire transfers ordered by the Targets, emails, and spreadsheets reflecting the information gathered and processed by the Gateway."[20]  Government agents corroborated these records by interviewing patrons who funded gambling accounts through the Gateway.  Without exception, these persons confirmed "that they opened wagering accounts with the identified Internet gambling web sites, and the manner in which those accounts were funded."[21]  Agents "also confirmed the existence of the bank accounts described by the Cooperating Witnesses and reflected in their records."[22]

      In March 2005, the Targets learned that LG Card was no longer willing to process the Gateway's credit card transactions due to an investigation by Visa International.  Shortly after that, the Targets were forced to close the account with First Global Bank in Jamaica and transfer its funds to an account in Antigua.  According to Agent Hipwell's affidavit, the loss of these banking relationships "crippled the operations of Gateway Technologies and Hill Financial Services."[23]  This, and other circumstances, prompted the Cooperating Witnesses to leave their employment.

---

[20] Docket No. 125 Ex. A, at 16.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 11.

According to the Cooperating Witnesses, after their employment ceased, Hill Financial and Gateway Technologies moved to the Desert Lane address. This was corroborated with information that a copier leased to Hill Financial was moved to that address on March 30, 2006. Agent Hipwell also states that the Cooperating Witnesses had contacts with some of the Targets after their employment relationship terminated and that based on these contacts the Cooperating Witnesses believed the Targets were continuing to facilitate gambling in the United States.[24]

Agent Hipwell conducted a trash run at the Desert Lane address on October 16, 2006, and found the following:

> phone lists for Hill Financial Services and Gateway Technologies, including the personal phone numbers of most of the Targets, Korea Exchange bank reconciliations of accounts held by the Targets, Hill Financial Services and Gateway Technologies general ledger report excerpts, CurrenC Worldwide client invoices, an Antigua Overseas Bank envelope, and a cash reconciliation showing the balances of some bank accounts (both offshore and domestic) held by the Targets and/or business entitles used by the Targets.[25]

Another trash run at the Desert Lane address on March 19, 2007, revealed pages from the accounts payable ledgers of both Hill Financial and Gateway Technologies. These trash runs did not yield documents attributable to other businesses. During surveillance conducted on March 27, 2007, and March 28, 2007, Agent Hipwell observed several cars in the parking lot at the Desert Lane address, including a BMW registered to Hill Financial, a Mercedes-Benz registered to Defendant Carson-Selman, a Maserati registered to an entity controlled by Defendant Baron Lombardo, and a GMC registered to a known employee of Gateway Technologies. In a final trash run on April 23, 2007, IRS agents discovered mail addressed to Hill Financial, Gateway

---

[24]*Id.* at 28.

[25]*Id.*

Technologies, Defendant Baron Lombardo, Defendant Hill, and to a known employee of Gateway Technologies, as well as statements reflecting the accounts payable of Gateway Technologies and a letter to Defendant Carson-Selman about his lost or stolen baggage.

Finally, Agent Hipwell's affidavit revealed that the Cooperating Witnesses were given immunity by the government. It also stated that the Cooperating Witnesses had been threatened by the Targets and that the Targets sued the Cooperating Witnesses, alleging "violations of their employment agreements, misappropriation of intellectual property and embezzlement."[26] Nonetheless, the affidavit states that government investigators "[were] not aware of any instance in which information provided by the Cooperating Witnesses [had] proven to be in error."[27]

On May 9, 2007, Agent Hipwell submitted his affidavit in support of the search warrant application. That same day, the Magistrate Judge issued a warrant to search the premises located at the Desert Lane address.

The Court finds that Agent Hipwell's affidavit provided a substantial basis for the Magistrate Judge's finding of probable cause to search the premises at the Desert Lane address. Based on information and documentation provided by the Cooperating Witnesses as well as information collected by government agents during the course of the investigation,[28] the affidavit

---

[26]*Id.* at 11.

[27]*Id.* at 4.

[28]Defendants contend that many of the factual allegations in Agent Hipwell's affidavit are conclusory in that they fail to indicate their source. While it is true that each paragraph does not indicate the source of its information, a fair reading of Agent Hipwell's affidavit indicates that the bulk of its information was received from the Cooperating Witnesses, which was supplemented and corroborated by the independent investigative efforts of government agents. Defendants admit as much in their memorandum: "It is apparent that the affidavits in the present case contain allegations of illegal activity based primarily upon information provided by cooperating witnesses." Docket No. 167, at 18.

sets forth the alleged operations of an organization consisting of multiple business entities and individuals established for the purpose of fraudulently processing illegal gambling transactions for Internet gambling websites. More specifically, the Targets allegedly established a business infrastructure consisting of multiple entities, accounts, and relationships capable of processing and accounting for online transaction handling. This infrastructure was allegedly used to process Internet gambling payments. These payments were allegedly processed on behalf of gambling website clients by miscoding credit card transactions and receiving international money wires and then funneling the proceeds through multiple foreign banks before remitting it to those clients. Accordingly, the Court concludes that the Magistrate Judge had a substantial basis for finding probable cause that the Targets had violated federal law.

Defendants would require Agent Hipwell to provide an explanation as to how the conduct alleged in the warrant affidavit violates the statutes listed therein. However, this is not the law. Although a warrant affidavit "must provide the [magistrate judge] with a substantial basis for determining the existence of probable cause,"[29] it need not engage in legal analysis as to how the alleged facts satisfy each element of the alleged crime. Rather, it is the function of the magistrate judge to "make a practical, common-sense decision" as to whether the facts and circumstances stated in the affidavit amount to probable cause that a crime has been or is being committed and whether contraband or evidence of that crime "will be found in a particular place."[30] Agent Hipwell's affidavit satisfied the substantial basis requirement with regard to the alleged illegal activity.

---

[29] *Gates*, 462 U.S. at 239.

[30] *See id.* at 238.

The Court also finds the Magistrate Judge had a substantial basis for finding probable cause that evidence of the alleged crimes would be found at the Desert Lane address. As outlined in Agent Hipwell's affidavit, the Cooperating Witnesses informed government agents that after their employment ceased, Gateway Technologies and Hill Financial moved to the Desert Lane address. The Cooperating Witnesses also indicated their belief, based on contacts with some of the Targets after leaving their employment and based on discovery requests made in the civil case, that the Targets continued to facilitate illegal Internet gambling after the Las Vegas move.

Defendants argue that these statements were not corroborated and had become stale by the time the search warrant was sought. More specifically, Defendants contend the government surveillance of the Desert Lane premises may establish only that the Targets were conducting some sort of business there, but it cannot establish that the Targets were conducting the same type of business as that conducted at the Draper, Utah address—particularly in light of the "crippled" state of the business after losing some of its key banking relationships and many of its employees. Therefore, according to Defendants, without any subsequent link connecting the alleged criminal activity with the Desert Lane address, the statements of the Cooperating Witnesses are stale and, therefore, cannot establish probable cause.

Defendants are correct that, according to Agent Hipwell's affidavit, the Cooperating Witnesses were "former employees" of Gateway Technologies and Hill Financial as of at least February 2006. Thus, any information obtained during the course of their employment was at least 15 months old when Agent Hipwell executed his affidavit. Notably, however, the Cooperating Witnesses' statements as to their belief that the Targets continued to facilitate Internet gambling after the Las Vegas move were based on information obtained after the

11

termination of their employment. As outlined in Agent Hipwell's affidavit, the Cooperating Witnesses had proven to be credible sources throughout the investigation. On more than one occasion, government agents were able to confirm that information provided by the Cooperating Witnesses was correct.

More important, the subsequent investigative work of government agents provided a substantial basis for the Magistrate Judge to conclude that the information provided by the Cooperating Witnesses was sufficiently corroborated and refreshed. According to Agent Hipwell's affidavit, investigators learned that on March 30, 2006, a copier leased to Hill Financial was moved from the Draper, Utah location to the Desert Lane address. In the October 16, 2006 trash run, Agent Hipwell discovered documents consistent with the Cooperating Witnesses' statements that the Targets moved Gateway Technologies and Hill Financial to the Desert Lane address and continued to facilitate Internet gambling, including

> phone lists for Hill Financial Services and Gateway Technologies, including the personal phone numbers of most of the Targets, Korea Exchange bank reconciliations of accounts held by the Targets, Hill Financial Services and Gateway Technologies general ledger report excerpts, CurrenC Worldwide client invoices, an Antigua Overseas Bank envelope, and a cash reconciliation showing the balances of some bank accounts (both offshore and domestic) held by the Targets and/or business entitles used by the Targets.[31]

Of particular note are the "Korea Exchange Bank reconciliations" and the "Antigua Overseas Bank envelope." As outlined above, Korea Exchange Bank was one of the banks through which the proceeds of the miscoded credit card transactions were regularly funneled. Similarly, on at least one occasion, proceeds from gambling transactions were transferred to and from a bank in Antigua. Two subsequent trash runs, the last conducted on April 23, 2007, produced evidence

---

[31]Docket No. 125 Ex. A, at 28.

that Gateway Technologies and Hill Financial continued to operate at the Desert Lane address just a few weeks before Agent Hipwell executed his affidavit.

Finally, considering the nature and length of the alleged criminal activity, as well as the nature of the property sought to be seized, the Court concludes that the Magistrate Judge had a substantial basis for finding that the information in Agent Hipwell's affidavit was not stale.  The affidavit outlines the Targets' business as a criminal organization, consisting of multiple persons and entities, which had conducted the gambling transaction processing operation for years.  As this alleged criminal conspiracy was ongoing and continuous, the passage of time after the receipt of information is not of critical importance.[32]  Moreover, in applying for the Desert Lane warrant, Agent Hipwell sought authority to seize business records.  The alleged gambling transaction processing business produced a significant amount of business records, as demonstrated by the records provided by the Cooperating Witnesses to the government.  These records—generated in part to allow the gambling website clients to review transaction data[33]—were likely to be kept for some time after their creation.[34]  Considering these factors, the Court is satisfied that the information in Agent Hipwell's affidavit was not stale.

In summary, based on the information provided by the Cooperating Witnesses, which was corroborated and refreshed by government surveillance, and considering the nature of the

---

[32]*See United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990) (where defendant was linked to ongoing conspiracy, "passage of time [was] less critical"); *Snow*, 919 F.2d at 1460.

[33]Docket No. 125 Ex. A, at 6.

[34]*See Williams*, 897 F.2d at 1039 (finding that "telephone, business, financial, and other records" of "an extensive criminal enterprise are likely to be present for some time"); *Snow*, 919 F.2d at 1460 ("[T]he items sought, which included records of defendant's activities, were of the type that would be kept for some time given the nature of defendant's activities.").

alleged ongoing and continuous criminal activity, the Court finds the Magistrate Judge had a substantial basis for finding probable cause that evidence (specifically business records) of the crimes alleged in Agent Hipwell's affidavit would be found at the Desert Lane address.[35]

B.  Plaza Del Grande Warrant

On May 11, 2007, Special Agent Hill submitted an affidavit in support of a warrant application to search Defendant Baron Lombardo's Plaza Del Grande residence.  Agent Hill's affidavit incorporates the affidavit of Agent Hipwell, stating that the Hipwell affidavit outlines the investigation into the Targets' alleged criminal activity.

In the Plaza Del Grande Motion, Defendants summarily assert that Agent Hill's affidavit is insufficient to support the Magistrate Judge's determination of probable cause and that the good faith exception to the exclusionary rule does not apply.  In their post-hearing memorandum, Defendants argue only that the information in Agent Hipwell's affidavit, upon which much of Agent Hill's affidavit was based, was stale.

The following is a brief summary of the content of the Hill affidavit:  On the morning of May 10, 2007—the day after Defendants were indicted and the Desert Lane warrant was issued—Agent Hill accompanied personnel from the U.S. Marshals Service to the Plaza Del Grande address to execute an arrest warrant for Defendant Baron Lombardo.  A U.S. Marshal jumped an exterior fence into a courtyard area and knocked on the door.  Defendant Baron Lombardo's girlfriend, Ms. Bassler, answered the door and invited agents into the residence.  She informed the agents that Defendant Baron Lombardo was not home, but that she would call him.

---

[35]In light of this finding, the Court need not reach the Government's contention that the good faith exception to the exclusionary rule applies with respect to the evidence seized in execution of the Desert Lane warrant.

Agent Hill did not initially accompany the agents into the house. A few minutes after their initial entry, one of the Marshals came out and informed Agent Hill that there were a number of computers inside the home. As Agent Hill entered the courtyard, but before entering the house, he was able to see several computers in the house through a window. According to Agent Hill, Ms. Bassler gave him permission to look in the room containing the computers. In the room there were three or four desks each with a computer or some type of electronic equipment as well as a server located in a "nook." Agent Hill spoke with Defendant Baron Lombardo on the phone, asking for consent to remove the computers, which Defendant Lombardo declined.

Federal agents maintained surveillance of the residence for much of the rest of the day, with Ms. Bassler allowing them into the courtyard area or the interior of the home (specifically the room where the computers were located) on at least two occasions. During these times, agents observed two additional computers, an additional server, and a laptop in the room housing the computers observed by Agent Hill.

Based on information received from Senior Special Agent McDermott, with whom Agent Hipwell had discussed the facts of the investigation, Agent Hill states that at some point prior to renting server space with Rackspace, the Gateway website was housed on a server located at Defendant Baron Lombardo's home. Additionally, Agent Hill indicates that a server found during the search of the Desert Lane address allowed remote access, potentially utilized by Defendant Baron Lombardo from the computers in his home.

Based on this information, Agent Hill's affidavit sought authority to seize business records related to the gambling transaction processing operation located on the computers and

other electronic equipment observed by agents in the Plaza Del Grande residence. On May 11, 2007, the Magistrate Judge issued a warrant to search the Plaza Del Grande residence.

As a preliminary matter, the Court finds that Defendants Carson-Selman, Hill, and Count Lombardo have no standing to challenge the search of the Plaza Del Grande residence. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."[36] The premises located at the Plaza Del Grande address is the personal residence of Defendant Baron Lombardo. None of the other Defendants has alleged anything in the briefing on the Motions to Suppress which would establish that they had a reasonable expectation of privacy in Defendant Baron Lombardo's private residence.

With regard to the substance of the Plaza Del Grande Motion, the Court finds that Agent Hill's affidavit provided a substantial basis for the Magistrate Judge's probable cause determination. As outlined in Agent Hipwell's affidavit—which was attached to and incorporated in Agent Hill's affidavit—the Defendants were being investigated for operating a business involving the fraudulent processing of illegal Internet gambling transactions. These transactions were processed through the Gateway, an Internet website. Agent Hill's affidavit contains information that at some point the Gateway website was housed on a computer server located in Defendant Baron Lombardo's home. The affidavit further specifies that a server located at the Desert Lane address allowed for remote access by other computers. When coupled with this background information, the firsthand observation of computers and computer servers at the Plaza Del Grande residence provided a substantial basis for the Magistrate Judge to

---

[36]*Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

conclude there was probable cause that evidence of the crimes alleged in the affidavits of Agent Hipwell and Agent Hill would be found at the Plaza Del Grande residence.

Defendants contend that the information provided by the Cooperating Witnesses, as outlined in Agent Hipwell's affidavit, was stale. However, as stated above, government surveillance of the Desert Lane premises sufficiently corroborated and refreshed the Cooperating Witnesses' claims that the Targets moved Gateway Technologies and Hill Financial to the Desert Lane address where they continued to facilitate Internet gambling. Additionally, the alleged criminal activity was ongoing and continuous. In light of the continuing nature of the alleged illegal business, its past connection to Defendant Baron Lombardo's residence, and government agents' May 10, 2007 observations, the Court finds the Magistrate Judge had a substantial basis to conclude that the information in Agent Hipwell's affidavit was not stale.[37]

### III.  CONCLUSION

As outlined above, it is hereby

ORDERED that Defendants' Motion to Suppress Evidence [Docket No. 74] and Motion to Quash Desert Lane Search Warrant and Suppress Evidence [Docket Nos. 77 and 106] are DENIED.

DATED May 22, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[37] In light of this finding, the Court need not reach the Government's contention that the good faith exception to the exclusionary rule applies to the evidence seized in execution of the Plaza Del Grande warrant.